HISCOCK, TRUSTEE IN BANKRUPTCY, *v.* MERTENS.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 209.  Argued February 27, 1907.—Decided March 25, 1907.

The provisions in § 70a of the bankruptcy act of 1898, that a bankrupt having policies of life insurance payable to himself and which have a cash-surrender value, may pay the trustee such value and thereafter hold the policies free from the claims of creditors, are not confined to policies in which the cash surrender value is expressly stated, but permit the redemption by the bankrupt of policies having a cash surrender value by the concession or practice of the company issuing the same.

THE facts are stated in the opinion.

*Mr. Will B. Crowley* for petitioner:

These policies are not strictly life insurance policies, but investments. They have no cash surrender value within the

meaning of the proviso in § 70–*a*–5 of the bankruptcy act, and the bankrupt is not entitled to take them from the trustee upon the payment of what the bankrupt claims is the cash surrender value thereof.

The bankrupt is not entitled to any interest in these policies and cannot take them from the trustee. This question has never been before this court, but the question has been expressly decided adversely to the claim of the bankrupt in the lower courts. *In re Welling*, 113 Fed. Rep. 189; *In re Slingluff*, 106 Fed. Rep. 154.

These cases hold that the term "cash surrender value" in the bankruptcy act refers to a value in cash provided by the terms of the policy itself, and which can be demanded as a contract right by the insured; that it does not mean a sum which the company will voluntarily pay, although not obligated to do so.

The "cash surrender value" contemplated by § 70–*a*–5 is not a value which may be obtained by means of negotiation or agreement, but that it is only such a value as can be demanded and legally enforced against an unwilling insurance company. *Pulsiver* v. *Hussey*, 9 Am. Bank. Rep. 657; 97 Maine, 434.

*Holden* v. *Stratton*, 198 U. S. 214, does not apply except as to statements which are *obiter*. The peculiar nature and qualities of a tontine policy were not developed in that case.

These policies did pass to the trustee. The claim of the bankrupt that policies which have no cash surrender value do not pass to the trustee, is not well taken.

These policies did, in fact, constitute assets and did pass to the trustee. It is quite clear from the terms of the policies themselves that they had an actual value. They come expressly within the first part of subdivision 5, namely, property which could have been transferred, because it appears from the evidence that these policies not only could have been transferred but were, as a matter of fact, prior to the bankruptcy, transferred as security for loans.

*Mr. Dorr Raymond Cobb* for respondent:

The policies in question had a cash surrender value within the meaning of § 70a of the bankruptcy act and upon the payment of that cash surrender value to the trustee, the bankrupt may continue to "hold, own and carry" said policies as permitted by that section of the act.

It appeared that the company had fixed the cash-surrender-value of each of the policies in question, and offered to pay the same, and such cash surrender values were stated on the record by one of the company's managers.

These cash surrender values which the company stood ready and offered to pay were based · on the definite method of computation referred to as applicable to all similar policies. Premiums on each of the policies having been paid for more than three years, respondent had at all · times the right to surrender either of his policies and receive in lieu thereof a paid-up policy "for the entire amount which the full reserve on this policy according to the present legal standard of the State of New York will then purchase. as a single premium calculated by the regular table for single premium policies now published and in use by the society." This is substantially the legal requirement in the State of New York.

The contractual and statutory obligation to give the insured a paid-up policy assures a cash surrender value and fixity and uniformity in its payment. It is apparent as a practical question that policies having a cash surrender value will have a paid-up policy value and *vice versa*.

Under the former bankruptcy act, insurance policies passed to the assignee in bankruptcy only to the extent of their "cash surrender value;" that being treated as the sum which the company would voluntarily pay upon the surrender of the policy. Congress did not manifest any intention to change the law as it had been understood and practiced under the former bankruptcy act. *In re MacKinney*, 15 Fed. Rep. 535.

Mr. Justice McKenna delivered the opinion of the court.

The question in this case is whether the cash surrender value of a policy of insurance under sections 70-*a*-5 of the bankruptcy act must be provided for in the policy, or whether it be sufficient, if the policy have such value by the concession or practice of the company. Section 70 provides that "the trustee of the estate of a bankrupt upon his appointment and qualification . . . shall be vested by operation of law with the title of the bankrupt as of the date he was adjudged a bankrupt, except in so far as it is to property which is exempt, to all (1) documents relating to his property . . . (3) powers which he might have exercised for his own benefit, but not those which he might have exercised for some other person . . . (5) property which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him: *Provided*, that when any bankrupt shall have any insurance policy which has a cash surrender value payable to himself, his estate or personal representatives, he may, within thirty days after the cash surrender value has been ascertained and stated to the trustee by the company issuing the same, pay or secure to the trustee the sum so ascertained and stated, and continue to hold, own and carry such policy free from the claims of the creditors participating in the distribution of the estate under the bankruptcy proceedings, otherwise the policy shall pass to the trustee as assets."

The respondent and his sons, individually and as composing the copartnership of J. M. Mertens & Co., were declared bankrupts, and petitioner was elected the trustee of their estate October 14, 1903.

At the time the petition in bankruptcy was filed Mertens held four life insurance policies issued by the Equitable Life Assurance Society of the United States. One of the policies, payable to his wife if she should survive him, has been dropped from this controversy. The other three policies were payable

to Mertens at his death, his executors, administrators or assignees. They were subject to certain claims arising from their having been assigned as security for certain loans. With these we are not concerned.

A dispute arose as to the ownership of the policies, and the trustee filed a petition in the District Court for the determination of the ownership of them and that Mertens be required to make an assignment of them to the trustee. Mertens answered, alleging that the policies had, by law and the regular practice of the Equitable Life Assurance Society, a cash surrender value which he had sought to pay to the trustee, and was ready and willing to pay; that it was the uniform practice of the society to pay, upon the surrender of such policies and on policies issued on any of the blank forms shown by the policies, the cash value thereof "determined in accordance with a fixed and definite method of computation, and stated on demand, by any policy holder or person in interest;" that the society, pursuant to law and in accordance with its practice, had stated to him and declared the cash surrender value of each of the policies and its readiness and willingness to pay such value upon the surrender of the policies. The values were stated.

The matter was referred to a special master to take the proofs and report the same, with findings of fact and conclusions of law. Proofs were taken and a report made in accordance with the order of the court. The master, in his report, describing the policies, said:

"None of these express any agreement or provision whereby upon default the company shall pay a 'cash surrender value' to any person. By their terms the assured is excluded from any participation in dividends until the completion of the tontine period, at which time all surplus and profits derived from such policies are to be divided among the persistent policies of that class then in force. At the expiration of the tontine period the persistent policy holder is given certain options, among them to withdraw in cash the policy's entire

share of the assets, that is, the accumulated reserve, the amount of which is stated in each policy, and, in addition, the accumulated surplus apportioned to the policy. Each of these policies also provides that upon default in payment of a premium and the surrender of the policy within six months thereafter the assured shall be entitled to a new paid-up policy, based upon the reserve accumulated under the old policy, but 'without participation in profits.' Both funds secured by the agreement, namely, the insurance proper and the endowment fund representing the accumulated profits, are payable to the assured or to his executors, administrators or assigns. No other person is mentioned in either of the policies as having any beneficial interest therein."

It appeared from the testimony that as a matter of fact policies of the character of those in controversy had, under the practice of the company, cash surrender values, if offered for surrender within six months from the date of the non-payment of any premium. Explaining this, a witness said:

"To make clear the replies of previous questions I will state that the Equitable Life Assurance Society would decline to purchase for cash a policy during the period for which premiums had been paid, entitling the policy holder to protection for the face value, for the reason that in the event of the death of the holder of that policy before the expiration of the period for which premiums had been paid, the question would be raised as to the liability of the company, so that the payment of an amount of cash for the surrender of a policy is only made by the company after that policy has lapsed by reason of the non-payment upon its due date." And it was testified that the cash surrender values of policies was determined by a fixed and definite method of computation, uniform in all cases, and had, without exception, been paid to persons insured by the company. It further appeared that the surrender values of the policies in controversy were as follows: Policy No. 274445, $5,905.65; policy No. 417678, $2,272.56; policy No. 417171, $6,574.00.

It was further testified that the surrender value of each policy was equivalent to the amount of a paid-up policy, which the company was willing to give. Or, as expressed by a witness, "it is equivalent to the percentage reserved under that policy (referring to policy No. 274445), which the company is willing to pay in consideration of the surrender."

The District Court held that the policies had no cash surrender value within the meaning of section 70 of the bankrupt act. The court said:

"In the policies in question not only is there a failure to provide for a cash surrender value, but the provisions are inconsistent with the existence of such a value. This, however, is not at war with the fact that the Assurance Association may be willing to pay money for the surrender of such policies. There is no pretence that this custom of the insurer formed a part of the contract between the parties, or that the insured could enforce the payment of a surrender value, or the payment of anything, on surrendering the policy. In short, the insurer might be willing to pay a surrender value and might not. Such payment would be optional with it."

And again:

"The association might be willing to pay one day, entirely unwilling the next. Is this the 'cash surrender value' spoken of in the bankruptcy law? This court thinks not. It would seem that had Congress intended that every bankrupt holding a policy of insurance of the nature of these should retain the same as his own on paying to the trustee in bankruptcy the value thereof that the insurer might fix by its custom or otherwise, it would have used language appropriate to that end, and not an expression implying a value the insured has a legal right to demand, and the insurer may be compelled to pay, a value generally understood to be provided for in the policy itself."

The court cited, to sustain its views, *In re Welling*, 113 Fed. Rep. 189, and *In re Stingluff*, 106 Fed. Rep. 154.

An order was entered requiring Mertens to assign the policies

to the trustees. It was reversed by the Circuit Court of Appeals. The latter court, however, said, that "it should be inclined to concur with the views expressed in *In re Welling,* and to sustain the conclusion of the District Judge in the cause at bar, that 'no policy is understood to have a cash surrender value unless provided for in the policy so as to be enforceable by the insured,' were it not for a subsequent expression of opinion by the Supreme Court. This is found in *Holden* v. *Stratton,* 198 U. S. 214, as follows:

" 'There has been some contrariety of opinion expressed by the lower Federal courts as to the exact meaning of the words " cash surrender value," as employed in the proviso, some courts holding that it means a surrender value expressly stipulated by the contract of insurance to be paid, and other courts holding that the words embrace policies, even though a stipulation in respect to surrender value is not contained therein, where the policy possesses a cash value which would be recognized and paid by the insurer on the surrender of the policy. It is to be observed that this latter construction harmonizes with the practice under the bankrupt act of 1867, *In re Newlands,* 6 Ben. 342; *In re McKinney,* 15 Fed. Rep. 535, and tends to elucidate and carry out the purpose contemplated by the proviso as we have construed it. However, whatever influence that construction may have, as the question is not necessarily here involved we do not expressly decide it.' "

The court observed that the extract from *Holden* v. *Stratton,* was *obiter* to the questions decided in the case, but considered it such an explicit declaration of views that the court expressed hesitation to disregard it.

We are hence confronted with the problem whether the *obiter* of *Holden* v. *Stratton* shall be pronounced to be the proper construction of section 70 of the bankrupt act. We may remark at the commencement that that *obiter* was not inconsiderately uttered, nor can it be said that it was inconsequent to the considerations there involved. It was there necessary to determine between conflicting decisions of two

Circuit Courts of Appeals upon the effect of state statutes of exemption from liability for debts, and a careful consideration of section 6 of the bankrupt act, which provided for exemptions, and section 70, which defined the property which passed to the trustee, was necessary to be made and their proper effect and relation determined. As elements in that consideration the meaning and scope of section 70 were involved and the purpose of Congress in its enactment. Section 6 provides for exemptions "prescribed, by the state laws." Section 70 vests the title of all the property of the bankrupt in the trustee, "except in so far as it is to property which is exempt." Then, after a designation of the property the title to which is transferred, follows the proviso in regard to insurance policies. It was argued that the proviso would be meaningless unless considered as wholly disconnected from the clause as to exempt property, and this court replied:

"As section 70a deals only with property which, not being exempt, passes to the trustee, the mission of the proviso was, in the interest of the perpetuation of policies of life insurance, to provide a rule by which, where such policies passed to the trustee because they were not exempt; if they had a surrender value their future operation could be preserved by vesting the bankrupt with the privilege of paying such surrender value, whereby the policy would be withdrawn out of the category of an asset of the estate. That is to say, the purpose of the proviso was to confer a benefit upon the insured bankrupt by limiting the character of the interest in a non-exempt life insurance policy which should pass to the trustee, and not to cause such a policy when exempt to become an asset of the estate. When the purpose of the proviso is thus ascertained it becomes apparent that to maintain the construction which the argument seeks to affix to the proviso would cause it to produce a result diametrically opposed to its spirit and to the purpose it was intended to subserve." 198 U. S. 213.

And, contemplating the proviso as having such purpose,

the court used the language quoted by the Circuit Court of. Appeals, and expressed the view that, as between the two constructions that had been made of the terms, "cash surrender value," whether they meant a stipulation in the contract or the recognition by the company, the latter harmonized with the practice under the bankrupt act of 1867 and tended to elucidate and carry out the purpose contemplated by the proviso as the decision construed it. And the precedent practice is necessarily a strong factor and would be so even if it had a less solid foundation in reason. It is nowhere better expressed than in *In re McKinney*, 15 Fed. Rep. 535. It is there pointed out that the foundation of the surrender value of a policy is the excess of the fixed annual premiums in the earlier years of the policy over the annual risk during the later years of the policy. "This excess," it was said, "in the premium paid over the annual cost of insurance, with accumulations of interest, constitutes the surrender value."

And further:

"Though this excess of premiums paid is legally the sole property of the company, still in practical effect, though not in law, it is moneys of the assured, deposited with the company in advance, to make up the deficiency in later premiums to cover the annual cost of insurance instead of being retained by the assured, and paid by him to the company in the shape of greatly increased premiums when the risk is greatest. It is the 'net reserve' required by law to be kept by the company for the benefit of the assured, and to be maintained to the credit of the policy. So long as the policy remains in force the company has not practically any beneficial interest in it, except as its custodian, with the obligation to maintain it unimpaired and suitably invested for the benefit of the assured. This is the practical, though not the legal, relation of the company to this fund.

"Upon the surrender of the policy before the death of the assured the company, to be relieved from all responsibility for the increased risk, which is represented by this accumu-

lating reserve, could well afford to surrender a considerable part of it to the assured, or his representative. A return of a part in some form or other is now usually made. . . ."

In *In re Newland*, 6 Ben. 342, it was said that the present value of a policy is its cash surrender value, and but for that "it could not be said to have any appreciable value. *Parker* v. *Marquis of Anglesey*, 20 Weekly Reporter, 162 and 25 Law Times Rep., new series, 482."

There is no expression in either of the cases that the cash surrender value depended upon contract as distinct from the usage of companies. And section 70 expresses no distinction. At the time of its enactment there were policies which stated a surrender value and a practice which conceded such value if not stated. If a distinction had been intended to be made it would have been expressed. Able courts, it is true, have decided otherwise, but we are unable to adopt their view. It was an actual benefit for which the statute provided, and not the manner in which it should be evidenced. And we do not think it rested upon chance concession. It rested upon the interest of the companies and a practice to which no exception has been shown. And that a provision enacted for the benefit of debtors should recognize an interest so substantial and which had such assurance was perfectly natural. What possible difference could it make whether the surrender value was stipulated in a policy or universally recognized by the companies. In either case the purpose of the statute would be subserved, which was to secure to the trustee the sum of such value and to enable the bankrupt to "continue to hold, own and carry such policy free from the claims of the creditors participating in the distribution of the estate under the bankruptcy proceedings."

Counsel for petitioner argues that the policies are mere investments, and intimates the injustice of keeping them from the trustee, and illustrates the comment by contrasting what the company would have paid as the surrender value of policy No. 274445, if default had been made in payment

of premiums, and what the company would pay six months thereafter. The contrast is between $5,905.65 and $11,318.40. But this is the result of the age of the policy, and cannot be a test of other policies or of the construction of the law. And a precisely like effect would result if the policy expressed a surrender value, in which case, it is conceded, it would come under the "law. The same comment is applicable to other arguments of petitioner which tend to confound the distinction between surrender value and other value. Section 70 deals with the former, and makes it the conditions of the relative rights of the bankrupt and the trustee of his estate. Pursuing the 'argument farther, it is said that "the right to participate in the profits was a part and parcel of the policy and of the privileges enjoyed thereunder;" and it is further observed that the difference between the value of the policy which was used for illustration, "if lapsed on September 8, 1903, given as $5,905.65, and its value on March 8, 1904, $11,318.40, is chiefly made up of the value of this right to participate in profits." And counsel for petitioner is disposed to think the contention absurd that the bankruptcy law contemplated that such a valuable right "could be absolutely wiped out and taken from the trustee in such a case as this by allowing the bankrupt to take up the policy by paying what the bankrupt here claims to be the surrender value." Such result would not appear to be absurd if the policy were only two years old instead of nineteen years. Manifestly a policy cannot be declared in or out of the law according to its age, nor can anything be deduced from the investment features of tontine policies. Such policies were decided to be covered by the law in *Holden* v. *Stratton*. Whether the law should have included them is not our concern. Whatever may be said against it, it has seemed best to the legislature to encourage the extra endeavor and sacrifice which such policies may represent.

It is further contended that respondent has not made out that the policies have a cash surrender value, because it appears

from the evidence that the company would not accept their surrender until they had lapsed, and that they had not lapsed either when the petition was filed or the bankruptcy adjudged. But this is tantamount to saying that no policy can ever have a surrender value. According to the testimony, policies which have a stipulation for such value are subject to the same condition. And there is nothing in the record to show that the practice and policies of other companies are not the same as those of the Equitable Life Assurance Society. Section 70 is broad enough to accommodate such condition. It permits the redemption of a policy by the bankrupt from the claims of creditors by paying or securing to the trustee the cash surrender value of the policy "within thirty days" after such value "has been ascertained and stated to the trustee by the company issuing the same."

*Judgment affirmed.*