LAKE

v.

NEW YORK LIFE INS. CO.

LAKE

v.

RELIANCE LIFE INS. CO. OF PITTSBURGH, PA.

LAKE

v.

EQUITABLE LIFE ASSUR. SOC. OF UNITED STATES.

LAKE

v.

JOHN HANCOCK MUT. LIFE INS. CO.

LAKE

v.

UNION CENTRAL LIFE INS. CO.

Civ. Nos. 5948, 5957, 6045, 6188, 6270.

United States District Court, D. Maryland.

June 23, 1954.

Piper & Marbury, William L. Marbury and Michael P. Crocker, Baltimore, Md., for plaintiff.

Anderson, Barnes & Coe, G. C. A. Anderson, Baltimore, Md., for New York Life Ins. Co.

Hilary W. Gans, Baltimore, Md., for Reliance Life Ins. Co. of Pittsburgh, Pa., and Equitable Life Assur. Soc. of United States.

Biscoe L. Gray, Baltimore, Md., for John Hancock Mut. Life Ins. Co.

F. Fulton Bramble, Baltimore, Md., for Union Central Life Ins. Co.

WILLIAM C. COLEMAN, Chief Judge.

These are five consolidated suits brought by the trustee in Bankruptcy of Eugene M. Callis against five life insurance companies which had issued eight policies on his life, prior to the date when an involuntary petition in Bankruptcy was filed in this court against him.

The principal question presented for decision is whether these life insurance companies, hereinafter referred to as the Companies, are entitled under Section 70, sub. a(5) of the Bankruptcy Act, 11 U.S.C.A. § 110, sub. a(5), before complying with the demand of the trustee to pay into the Bankruptcy estate the cash surrender values of the policies at the date of the filing of the Bankruptcy petition, to subtract therefrom the amount of certain loans which the Companies made to the insured bankrupt subsequent to that date without any knowledge of the Bankruptcy proceedings because of fraud of the bankrupt.

The combined amount of insurance embraced in these policies is $310,000, and, on the date when the involuntary petition in Bankruptcy was filed, they had

a total cash surrender value of $58,015.28. These policies named either the bankrupt's wife, Esther P. Callis, or his business associate, Ethel W. Hurst, as beneficiary.

There is no dispute between the parties as to most of the material facts involved in these combined suits. They have been stipulated. The separate complaints against the individual Companies are substantially identical, except for names, dates, and amounts. Likewise, the defenses raised by the Companies are the same in all cases. The material facts are as follows:

On August 6, 1951, an involuntary petition in Bankruptcy was filed against Eugene M. Callis, and this Court appointed Charles M. Lake receiver of his estate. At different times, all considerably prior to the aforementioned date, the eight life insurance policies already referred to had been issued by the defendant Companies to Callis. Between August 21 and 29, 1951, Callis presented these policies at the offices of the respective Companies and executed loan agreements, with the policies as the sole security; and in this way Callis was afforded loans by the Companies in the total amount of $45,334.28. At the time these loans were made Callis did not tell the Companies, and they had no knowledge, of the pending Bankruptcy proceedings, and Callis fraudulently certified in his written applications for five of these loans that there were no bankruptcy or insolvency proceedings pending against him. Callis caused the funds so obtained from the Companies to be deposited in his wife's bank account in Bryn Mawr, Pennsylvania, and his wife thereupon delivered to him 150 checks against this bank account, which were blank except for her signature. Callis maintained a business office in Philadelphia but resided in Queen Annes County, Maryland, on a farm from which he operated an extensive dairy business known as Kennersley Farm Dairy.

By August 9, 1951, the receiver had taken possession of all of the known assets of all kinds, real and personal property, of the bankrupt, including the dairy farm and the business and equipment connected therewith, and also bank accounts. Through the appointment of an ancillary receiver by the District Court for the Eastern District of Pennsylvania, all known property of the bankrupt in Philadelphia was brought under the receivership. The total value of all of this property was not capable of being established with certainty, but as of April 6, 1952, the certified public accountant, employed by the receiver to audit the books and accounts of the bankrupt, placed a valuation of $673,448 on the dairy business alone. The Bankruptcy schedules filed by Callis covering this same property gave a valuation of $300,530.10. The total amount realized by the present plaintiff, the trustee in Bankruptcy, from the sale of the bankrupt's assets was in the neighborhood of $400,000.

Callis resisted the petition to have him adjudicated a bankrupt, but he was so adjudicated on September 24, 1951. In the schedules which he filed he failed to list any of the eight insurance policies here in issue. He and his wife and Ethel W. Hurst were all examined in proceedings under section 21, sub. a of the Bankruptcy Act, 11 U.S.C.A. § 44, sub. a. It was then that the trustee in Bankruptcy and his counsel learned of the insurance policies; of an alleged transfer of them to Mrs. Callis and Miss Hurst, and of Callis' loan transactions against them hereinbefore explained. The trustee thereupon applied to this Court for, and obtained, authority to proceed to recover the policies and any part of the proceeds of the loans that could be reached. Turnover proceedings were accordingly instituted against Mrs. Callis and Miss Hurst and also against the banks in which the proceeds from the loans had been deposited, with the result that the eight policies and $6,261.57 in cash were recovered. The trustee admits that this amount of bank deposits represented some of the proceeds from the loans obtained from the Companies and from the sale of Callis' cattle.

Therefore, the trustee has conceded that the Companies are entitled to credit against their respective liabilities their pro rata share in this sum of $6,261.57.

The trustee requested the Companies to state the cash surrender values of the policies as of August 6, 1951, the date of the filing of the petition in Bankruptcy, and, upon receipt of this information, he notified Callis of same and tendered him the option of paying the amount of these values and keeping his policies in force, pursuant to his right under section 70, sub. a(5), 11 U.S.C.A. § 110, sub. a(5). However, Callis failed to exercise this option.

In addition to the present combined suits against the five Companies, the plaintiff instituted proceedings in the Circuit Court of Queen Annes County, Maryland, to recover from Callis and his wife the amount of a loan made to him by another insurance company, namely, the Mutual Benefit Life Insurance Company; and he also instituted proceedings against another insurance company, the Home Life Insurance Company, similar to the present consolidated suits, in the Superior Court of Baltimore City, the amount involved in that suit being less than the federal jurisdictional requirement.

None of the Companies in the present combined suits had any notice of the trustee's possession of the policies until they received letters from him under date of April 3, 1952, enclosing their respective policies and demanding payment of the cash surrender value of each, as of August 6, 1951. On February 25, 1953, in the course of proceedings relating to the question of discharge of the bankrupt, the trustee entered into a stipulation with the bankrupt as to his loan transactions with the five Companies; the subsequent deposit of the funds realized from these loans in Mrs. Callis' bank account, and the issuance by her to her husband of the 150 signed checks hereinbefore referred to. In this stipulation it appears that these checks were drawn upon the deposits derived from the loans in the following amounts and

for the following purposes: $31,884.41 paid to creditors of Callis trading as Kennersley Farm Dairy; $6,261.57 surrendered to the trustee pursuant to a turnover order of this Court; $9,088.20 paid to certain other creditors of Callis; $4,533 paid on account of insurance premiums due on the policies here in issue; and $5,091.11 expended for various other purposes by Callis.

There are three primary issues raised by the aforegoing facts: (1) Did the cash surrender value of the policies pass as of August 6, 1951, the date of the filing of the petition in Bankruptcy against Callis, to the trustee as assets of the Callis bankruptcy estate? (2) Are the Companies entitled to subtract from the cash surrender values of the policies as of that date the full amount of the loans which Callis fraudulently obtained from the Companies subsequent to that date? (3) If not, are the Companies entitled at least to credit for sums paid by Callis from the proceeds of these loans to his creditors, who would otherwise have been entitled to file claims in the bankruptcy proceeding?

On behalf of the plaintiff trustee, it is maintained that the first of the aforegoing three questions must be answered in the affirmative, and the remaining two in the negative. In other words, summarized, the position taken by the plaintiff trustee is that when insurance companies, even though in good faith, as is conceded was true in the present case, make loans to a bankrupt who wilfully fails to disclose his bankruptcy status and a receiver has been appointed, and if the receiver is in possession of all or a greater portion of the nonexempt property of the bankrupt, they are not entitled to deduct such loans from the cash surrender values of the policies to which the trustee is entitled, pursuant to the provisions of section 70, sub. a of the Bankruptcy Act.

On behalf of the Companies it is contended that the foregoing position of the trustee is untenable because (1) the loans in the present cases were made by the Companies in strict accordance with

the express terms of the several policies, and long before the trustee acquired any right under the Bankruptcy Act to the cash surrender values of these policies; (2) the trustee, with full knowledge of the loans outstanding against the cash surrender values of the policies, elected to pursue and accept the proceeds and benefits of the loans, rather than to elect to institute proceedings against the Companies to collect the loans; and (3) the trustee is estopped to recover loans from which the Bankruptcy estate has benefited through use of proceeds of these loans to pay creditors of the bankrupt.

■ In addition to the aforegoing grounds of defense to the trustee's position, the Companies assert that on the ·date when the loans were made the trustee did not have all or the greater portion of the bankrupt's property in his possession, which is a condition precedent to recovery pursuant to section 70, sub. d(4) of the Bankruptcy Act, 11 U.S.C.A. § 110, sub. d(4). Without quoting the text of this section, suffice it to say that its provisions have the effect of charging with notice of their unprotected position those who deal with a bankrupt after a receiver or trustee is in possession of all or the greater portion of the non-exempt property of the bankrupt. In the present case the Court is satisfied by the weight of the credible evidence that the plaintiff receiver here did have such possession. It is clear that by August 21, 1951, the trustee had taken possession of all of Callis' securities, bank accounts and personal effects, as well as the business Callis conducted under the name of Kennersley Farm Dairy. If the test of value is the ultimate realization by the trustee, then the value of these assets would, according to the stipulation of the parties, not exceed $280,000. If the test is the value placed upon these assets by Callis himself in his bankruptcy schedule, then their value would be approximately $343,000. However, if due weight is given to the certified balance sheet of the accountant employed by the trustee as of the date just prior to the filing of the petition in bankruptcy, then a value in the neighborhood of $600,000 would not be improper.

■ The Companies also make the point that the trustee is estopped by reason of his acquiescence in an opinion of the Referee in Bankruptcy limiting the trustee's right of recovery to the existing cash surrender values less the loans, and also because he has recognized, by stipulation, that the loans were used for the benefit of the bankrupt estate. We believe that these things should not bind the trustee if being so bound would produce a result contrary to what the Bankruptcy Act requires.

■ There is another contention made by the Companies, namely, that the trustee is barred from recovery against them because of section 70, sub. b of the Act, 11 U.S.C.A. § 110, sub. b, which provides that within sixty days after the adjudication the trustee shall assume or reject any executory contracts, and if not assumed or rejected within such time, whether or not a trustee has been appointed or has qualified, shall be deemed to be assumed or rejected. This contention also is believed to be without merit, since the Bankruptcy Act provides specifically and separately for the treatment to be given to policies of insurance by section 70, sub. a(5), U.S.C.A. § 110 sub. a(5), and we are satisfied that this special treatment given to insurance policies is dominant and conclusive, although we have been referred to no decision on this precise question.

■ Finally,· still another defense is asserted by the Companies based upon the doctrine of so-called election of remedies, the Companies claiming that the trustee is barred from maintaining the present suit because he adopted an inconsistent position by attempting to recover from Callis and his wife the proceeds of the insurance loans, and, in fact, has recovered approximately $6,000 of such proceeds in the form of bank accounts. The Companies say that the trustee thereby ratified Callis' action in making the loans. However, we find no merit

in this contention. We consider it completely overcome by the decision of the Supreme Court in Thomas v. Sugarman, 218 U.S. 129, 30 S.Ct. 650, 54 L.Ed. 967. There it was held that the fact that a trustee in Bankruptcy had obtained a money judgment against one to whom the bankrupt had transferred certain assets, for the purpose of delaying and defrauding creditors, did not amount to ratification by the trustee of the bankrupt's act, or to an election not to pursue his assets that had been so transferred, but that, on the contrary, the trustee was entitled also to maintain a bill in equity to set aside the transfer. In other words, the Supreme Court decided that the defense of election of remedy is not available against a trustee in Bankruptcy who is only doing his statutory duty to explore every possibility for gathering in all assets of the bankrupt estate. Furthermore, in the present cases the Companies have not in any way been prejudiced by the trustee's pursuit of alleged inconsistent remedies. The doctrine of election of remedy is rooted in estoppel and is not available as a defense unless a defendant has materially changed his position as a consequence of what plaintiff has done. See North American Graphite Corp. v. Allan, 87 U.S.App.D.C. 154, 184 F.2d 387.

We, therefore, now turn to a detailed consideration of the three primary issues in the case, the first of which is whether the cash surrender values of the policies as of August 6, 1951, the date of the filing of the petition in Bankruptcy against Callis, passed to the trustee as assets of the Callis Bankruptcy estate. The property of the bankrupt to which the trustee succeeds is defined in section 70, sub. a of the Bankruptcy Act, 11 U.S.C.A. § 110, sub. a. There it is provided that the trustee of the estate of a bankrupt is "vested by operation of law with the title of the bankrupt as of the date of the filing of the petition initiating a proceeding under this title, except insofar as it is to property which is held to be exempt, to all of the following kinds of property wherever located * * *."

The eight kinds of property are enumerated, the fifth kind being "property, including rights of action, which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him, or otherwise seized, impounded, or sequestered". Then follow two provisos, the first of which has no relation to the present controversy, but the second reads as follows: "And provided further, That when any bankrupt, who is a natural person, shall have any insurance policy which has a cash surrender value payable to himself, his estate, or personal representatives, he may, within thirty days after the cash surrender value has been ascertained and stated to the trustee by the company issuing the same, pay or secure to the trustee the sum so ascertained and stated, and continue to hold, own, and carry such policy free from the claims of the creditors participating in the distribution of his estate under the bankruptcy proceedings, otherwise the policy shall pass to the trustee as assets; * * *."

The Supreme Court has, in a series of cases, construed the corresponding provision relating to insurance as first contained in the Bankruptcy Act in section 70, sub. a of the Act of July 1, 1898, and which was substantially the same as it now reads. These cases are Burlingham v. Crouse, 228 U.S. 459, 33 S.Ct. 564, 57 L.Ed. 920; Everett v. Judson, 228 U.S. 474, 33 S.Ct. 568, 57 L.Ed. 927; Andrews v. Partridge, 228 U.S. 479, 33 S.Ct. 570, 57 L.Ed. 929; Cohen v. Samuels, 245 U.S. 50, 38 S.Ct. 36, 62 L.Ed. 143; Cohn v. Malone, 248 U.S. 450, 39 S.Ct. 141, 63 L.Ed. 352; and Frederick v. Fidelity Mutual Life Insurance Co., 256 U.S. 395, 41 S.Ct. 503, 65 L.Ed. 1009. The first three of these cases were decided in 1913 and the last one in 1921.

In the Burlingham case the question presented for decision was whether under section 70, sub. a, life insurance policies which at the time when the petition in bankruptcy was filed, as well as the date of adjudication, had no cash sur-

render value because this had been dissipated by a loan upon the policies, passed to the trustee of the bankrupt estate or remained the property of the bankrupt. The Court held that the policies remained the property of the bankrupt and that the assignee of the policies had the right to retain them on the same terms that the bankrupt might have retained them. The facts in this case were thus quite different from those here involved. However, in its opinion the Supreme Court reviewed the history of section 70, sub. a, which is pertinent. It said, 228 U.S. at page 470, 33 S.Ct. at page 566: "Under the bankruptcy act of 1867 no special provision was made for insurance policies. The section providing for the passing of the assets of the bankrupt to the trustee contained the broad language of 'all the estate, real and personal'." The Court analyzed its earlier decision in Holden v. Stratton, 198 U.S. 202, 25 S.Ct. 656, 49 L.Ed. 1018, in which it had been decided that policies of insurance exempt under the law of the state of the bankrupt were exempt under section 6 of the Bankruptcy Act of 1898, 11 U.S. C.A. § 24, even though they were endowment policies payable to the insured during his lifetime and had cash surrender values, the provisions of the then section 70, sub. a being held not applicable to policies exempt under a state law. The Supreme Court analyzed its previous decision in Hiscock v. Mertens, 205 U.S. 202, 27 S.Ct. 488, 51 L.Ed. 771, in which the Court held that a bankrupt having policies of life insurance payable to himself and which had a cash surrender value, even though not expressly stated but existing by concession or practice of the issuing company, was permitted under the then section 70, sub. a to pay the trustee such value and thereafter to hold the policies free and clear. Then the Court continued with its interpretation of the underlying purpose of section 70, sub. a and said, 228 U.S. at page 471–473, 33 S.Ct. at page 567: "True it is that life insurance policies are a species of property and might be held to pass under the general terms of subdiv. 5, § 70a, but a proviso dealing with a class of

this property was inserted and must be given its due weight in construing the statute. It is also true that a proviso may sometimes mean simply additional legislation, and not be intended to have the usual and primary office of a proviso, which is to limit generalities and exclude from the scope of the statute that which would otherwise be within its terms.

"This proviso deals with explicitness with the subject of life insurance held by the bankrupt which has a surrender value. Originally life insurance policies were contracts in consideration of annual sums paid as premiums for the payment of a fixed sum on the death of the insured. It is true that such contracts have been much varied in form since, and policies payable in a period of years, so as to become investments and means of money saving, are in common use. But most of these policies will be found to have either a stipulated surrender value or an established value, the amount of which the companies are willing to pay, and which brings the policy within the terms of the proviso (Hiscock v. Mertens, supra), and makes its present value available to the bankrupt estate. While life insurance is property, it is peculiar property. Legislatures of some of the states have provided that policies of insurance shall be exempt from liability for debt, and in many states provision is made for the protection from such liability of policies in favor of those dependent upon the insured. See Holden v. Stratton, supra.

"Congress undoubtedly had the nature of insurance contracts in mind in passing § 70a with its proviso. Ordinarily the keeping up of insurance of either class would require the payment of premiums perhaps for a number of years. For this purpose the estate might or might not have funds, or the payments might be so deferred as to unduly embarrass the settlement of the estate. Congress recognized also that many policies at the time of bankruptcy might have a very considerable present value which a bankrupt could realize by surrendering his

policy to the company. We think it was this latter sum that the act intended to secure to creditors by requiring its payment to the trustee as a condition of keeping the policy alive. In passing this statute Congress intended, while exacting this much, that when that sum was realized to the estate, the bankrupt should be permitted to retain the insurance which, because of advancing years or declining health, it might be impossible for him to replace. *It is the twofold purpose of the bankruptcy act to convert the estate of the bankrupt into cash and distribute it among creditors, and then to give the bankrupt a fresh start with such exemptions and rights as the statute left untouched. In the light of this policy the act must be construed. We think it was the purpose of Congress to pass to the trustee that sum which was available to the bankrupt at the time of bankruptcy as a cash asset; otherwise to leave to the insured the benefit of his life insurance."* (Emphasis supplied.)

The Everett case was argued at the same time as the Burlingham case and, insofar as the two were alike, the principles laid down in the Burlingham case were held to be controlling in the Everett case. It, however, involved a feature not directly involved in the Burlingham case, because in the Everett case the insured had committed suicide before his adjudication in bankruptcy, although after the filing of the petition, and it was contended by the trustee in Bankruptcy that the Bankruptcy Act vested in him the title to the bankrupt's property as of the time of the adjudication, and that therefore the bankrupt's death between the filing of the petition and the date of the adjudication made the proceeds of the policies assets in the hands of the trustee. But the Court said, 228 U.S. at page 479, 33 S.Ct. at page 569: *"We think that the purpose of the law was to fix the line of cleavage with reference to the condition of the bankrupt estate as of the time at which the petition was filed and that the property which vests in the trustee at the time of adjudication is that which the bankrupt owned at the time of the filing of the petition. And it is as of that date that the surrender value of the insurance policies mentioned in § 70a should be ascertained. The subsequent suicide of the bankrupt before the adjudication was an unlooked-for circumstance which does not change the result in the light of the construction which we give the statute."* (Emphasis supplied.)

The Andrews case was also argued at the same time as the Burlingham and Everett cases, a material factual difference in the Andrews case being that the bankrupt died a few days after the filing of the petition for his involuntary bankruptcy but before adjudication. The Circuit Court of Appeals had held that the cash surrender value of the policy must be ascertained as of the date of the filing of the petition in Bankruptcy. However, while construing section 70, sub. a of the Bankruptcy Act as vesting title to the policies in the trustee, subject to the right of the bankrupt to pay or to secure to the latter the cash surrender value of the policies and to continue to hold and own them, it nevertheless held that this right was extinguished by the bankrupt's death before his adjudication. Reaffirming its decisions in the Burlingham and Everett cases, the holding of the Circuit Court of Appeals in the Andrews case was accordingly reversed by the Supreme Court.

Next, in the Cohen case the Supreme Court further clarified its construction of section 70, sub. a in holding that a policy of insurance held by a bankrupt which had a cash surrender value at the time of the adjudication became an asset of the trustee to the extent of such value, even though the policy was payable to a beneficiary other than the bankrupt, his estate or personal representative, if the bankrupt had reserved absolute power to change the beneficiary in the policy.

About a year later, in the Cohn case, the Court affirmed its ruling in the Cohen case under slightly different facts, namely, where a provision in the Code of the State of Georgia was involved to the effect that an insured may assign his life

insurance by directing payment to his personal representative, the widow, or children, or assignee, and that no other person could defeat such direction when assented to by the insurance company. The Court held that this provision did not operate to withdraw the cash surrender value from the bankrupt's estate, since the assignment was made to the bankrupt's wife expressly subject to his right to change the beneficiary or to surrender the policy at any time.

We now turn to the sixth and the last of the series of cases to which we have referred, construing section 70, sub. a of the Bankruptcy Act as it stood prior to its amendment in 1938, namely, the Frederick case. There the Supreme Court held that an insurance company which had paid to the beneficiary of a life insurance policy the amount thereof in strict conformity with the terms of the policy, after the death of the insured, and without having had any notice of his pending bankruptcy or of any claim made by the bankrupt's trustee, was not liable to the trustee for the cash surrender value of the policy under section 70, sub. a. We thus find that this case is the first of the series of six decided by the Supreme Court in which the facts bear a somewhat close analogy to the facts in the case before us. In the Frederick case, the insurance company, in entire good faith, without any knowledge of the bankruptcy proceedings, and without any claim being made by the trustee for the cash surrender value, paid the properly named beneficiary the amount of the policy. In the case before us the various defendant Companies made loans to the bankrupt, Callis, in entire good faith, after involuntary bankruptcy proceedings had been instituted against him, without any knowledge of these proceedings, and in the case of most of the loans Callis practised a particularly wilful fraud upon the defendant Companies, in that he certified in the written application for the loan that there were no bankruptcy or insolvency proceedings pending against him. We therefore consider it pertinent to quote in full the following ratio decidendi of the opinion of the Supreme Court in the Frederick case, as follows, 256 U.S. 397–399, 41 S.Ct. at page 504: "This provision [the one as to insurance in Section 70, sub. a of the Act of July 1, 1898] shows it was the purpose of Congress to pass to the trustee whatever sum was available to the bankrupt at the time of bankruptcy as cash assets to be realized on surrender of the policy, but otherwise to leave to the insured the benefit of his life insurance. Burlingham v. Crouse, 228 U.S. 459, 473, 33 S.Ct. 564, 57 L.Ed. 920; Everett v. Judson, 228 U.S. 474, 33 S.Ct. 568, 57 L.Ed. 927. In two recent cases, Cohen v. Samuels, 245 U.S. 50, 53, 38 S.Ct. 36, 62 L.Ed. 143, and Cohn v. Malone, 248 U.S. 450, 39 S.Ct. 141, 63 L.Ed. 352, we have held that the surrender value of a policy not in terms payable to, the bankrupt, but which could be made so payable at the bankrupt's will by a simple declaration changing the beneficiary, must be regarded as assets to which the trustee in bankruptcy was entitled. In each case the question arose while the policy was in the bankrupt's possession unmatured, and the interest of the insurance company was not affected. *Here the question is whether, after the death of the insured and payment of the, stipulated amount to the beneficiary named in the policy in strict conformity to its terms, without notice of the bankruptcy, or claim made by the trustee, there is a liability on the part of the insurance company to pay to the trustee the surrender value that, on complying with the terms of the policy, he might have demanded.*

*"It is not enough to sustain the trustee's claim to say that the filing of the petition in bankruptcy was a caveat to all the world, and in effect an attachment and injunction, and that on adjudication title to the bankrupt's property became vested in the trustee. Mueller v. Nugent, 184 U.S. 1, 14, 22 S.Ct. 269, 46 L.Ed. 405. The asserted right of property arose out of a contract under which the insurance company had rights as well as the insured. The company's contract was to pay the stipulated amount to the benefici-*

ary first named on receiving proof of death of the insured, unless the latter should have surrendered the policy and, with the written approval of the head officer of the company, have changed the beneficiary. The requirement of such surrender and approval was for the protection of the company, so purposed that at least it should have notice before its liability under the policy was modified. *Section 70a of the Bankruptcy Act cannot be construed to give to the trustee in bankruptcy a right as against the company to demand that the surrender value be made assets of the estate, as by a change in beneficiary, without timely notice to the company of a demand for such a change; for the section in its very words contemplates that the cash surrender value shall have been 'ascertained and stated to the trustee by the company issuing the policy.'*

"*In the present case, the company, having in good faith performed the contract according to its terms, without the notice that the contract called for as a condition of changing the terms, cannot be called upon to make the further payment demanded by the trustee. Frederick v. Metropolitan Life Ins. Co., 3 Cir., 239 F. 125.*" (Emphasis supplied.)

■ Relying upon the six Supreme Court decisions which we have just analyzed, and particularly upon the decision in the Frederick case, it is contended on behalf of the trustee that he became entitled to the cash surrender values of the insurance policies here in issue as of the date of the filing of the petition in bankruptcy and was entitled to collect those values from the Companies without regard to subsequent events; that if the value of the policies had been later enhanced by reason of the payment of an additional premium or the death of the insured, the Bankruptcy estate could not benefit thereby; and that, by the same token, if the value of the policies was later diminished by reason of payment by the Companies, the rights of the trustee in Bankruptcy could not be affected.

We conclude that the aforegoing contention of the trustee is a correct state-ment of the *general* principle of law as laid down in the six decisions which we have just analysed, but that there are exceptions to the *general* rule, as evidenced by the decision in the Frederick case upholding one such exception, namely, if, upon the death of the insured the trustee does not make claim in due course, as required by Section 70, sub. a and meanwhile the company has paid the beneficiary the insurance in accordance with the policy, the company is not liable to the trustee for the cash surrender value of the policy. The Companies in the present case maintain that the fraud practised on them by the bankrupt creates another exception to the general principle just stated entitling them to deduct the loans made by them to Callis subsequent to the filing of the petition in Bankruptcy, that is, between August 27 and August 29, 1951, from the cash surrender values of the policies as of the date of the filing of the petition, before making payment to the trustee. Whether this is correct is the second main issue.

The trustee contends that those who in good faith pay an indebtedness to the bankrupt after a receiver or trustee appointed by the Court is in possession of all or a greater portion of the nonexempt property of the bankrupt which, as previously stated in this opinion, we find is true with respect to the trustee here, are not entitled to credit for such payments against the receiver's or trustee's claim. Reliance is placed by the trustee upon the provisions of section 70, sub. d of the Bankruptcy Act, 11 U.S.C.A. § 110, sub. d, an entirely new section enacted as part of the broad revision of the Act, known as the Chandler amendments of 1938. This section had no counterpart in the Act of July 1, 1898. It provides as follows:

"(d) After bankruptcy and either before adjudication or before a receiver takes possession of the property of the bankrupt, whichever first occurs—

"(1) A transfer of any of the property of the bankrupt, other than real estate, made to a person acting in good faith shall be valid against the trustee

if made for a present fair equivalent value or, if not made for a present fair equivalent value, then to the extent of the present consideration actually paid therefor, for which amount the transferee shall have a lien upon the property so transferred;

"(2) A person indebted to the bankrupt or holding property of the bankrupt may, if acting in good faith, pay such indebtedness or deliver such property, or any part thereof, to the bankrupt or upon his order, with the same effect as if the bankruptcy were not pending;

"(3) A person having actual knowledge of such pending bankruptcy shall be deemed not to act in good faith unless he has reasonable cause to believe that the petition in bankruptcy is not well founded;

"(4) *The provisions of paragraphs (1) and (2) of this subdivision shall not apply where a receiver or trustee appointed by a United States or State court is in possession of all or the greater portion of the non-exempt property of the bankrupt;*

"(5) A person asserting the validity of a transfer under this subdivision shall have the burden of proof. Except as otherwise provided in this subdivision and in subdivision g of section 44 of this title [the latter not being relevant to the question before us], no transfer by or in behalf of the bankrupt after the date of bankruptcy shall be valid against the trustee: Provided, however, That nothing in this title shall impair the negotiability of currency or negotiable instruments." (Emphasis supplied.)

The trustee maintains that whatever may have been true under the law before the insertion of section 70, sub. d, its provisions must be interpreted as meaning that, unless specifically granted protection, no transaction, no matter how bona fide, for adequate present value after Bankruptcy can be protected. There is to be found some support for this position. See House Report No. 1409, on H.R. 8046, 75th Cong., 1st Sess. (1937) 35; Collier on Bankruptcy, 4th Ed., Volume 4, pages 1326, 1331–32, 1336, 1339. Collier thus interprets subsection (4) of section 70, sub. d, with which we are here directly concerned, as follows (Vol. 4, p. 1336): "The good sense of this provision is apparent. It has been pointed out that the situation is analogous to that where a Bankruptcy receiver has been appointed and has taken possession of the property. In either case the terms of clauses (1) and (2) of section 70(d) do not apply. The possession and dominion of a court officer is deemed sufficient notice to everyone of the bankrupt's impaired condition, and hence protection is not afforded in such an event". With respect to subdivision (5) of section 70(d) Collier says (p. 1332): "Clause (5) of subdivision (d) contains the stipulation that 'except as otherwise provided in this subdivision and in subdivision g of section 21 of this Act, no transfer by or in behalf of the bankrupt after the date of bankruptcy shall be valid against the trustee'. This is subject to the proviso hereinbefore noted that nothing in the Act shall be deemed to impair the negotiability of currency or negotiable instruments. The apparent intent is to invalidate all transfers not granted specific protection under the Act and thus setting definite limits beyond which the Court may not go in carrying out the theory of protected transactions".

From the foregoing it is contended on behalf of the trustee that when the receiver took possession of Callis' property on August 9, 1951, that fixed the cash surrender values of the policies as of that date, and that the values so fixed passed to the trustee by operation of law; that section 70, sub. d(4) made the possession by the receiver sufficient notice to everyone, including the Companies, of Callis' impaired financial condition, and that, therefore, when the Companies later, in August, made loans to Callis, they did so at their peril. Reliance is placed upon Equitable Life Assurance Society v. Miller, 8 Cir., 185 F. 98. There the insurer, with knowledge that the insured had been adjudged a

bankrupt, nevertheless made a loan to him. The Court held the trustee in Bankruptcy entitled to the cash surrender value of the policy, despite the loan. In the situation before us, however, the insurance Companies were not aware of the Callis bankruptcy proceedings, and the bankrupt Callis practised a fraud upon them by actually denying with respect to most of his loan applications, that there existed any such proceedings, and with respect to the other applications, by failing to disclose the truth.

The trustee seeks to meet the decision in the Frederick case by flatly saying that it is no longer law since the Chandler Act amendment of 1938 embodying the provision of section 70, sub. d(4) which we have just analysed. In short, he asserts as entirely erroneous the contention of the Companies that life insurance is excepted from the provisions of section 70, sub. d in the absence of some clear expression that it was not the intent of Congress so to except life insurance.

On behalf of the trustee we are urged to give great weight to the views of the reviser and principal rewriter of section 70 of the Bankruptcy Act, Professor James A. McLaughlin. In his Analysis of H.R. 12889, 74th Cong.2d Sess., 1936, pp. 229–230, which was furnished the Committee on the Judiciary, House of Representatives, the Frederick case is analysed and the following is stated: "The question is whether the Bankruptcy Act requires the debtor to pay at his peril. The Court says no, and the decision is not one of those legal oddities 'to be limited to the facts of the particular case'. Stone v. Superior Fire Ins. Co., 278 Pa. 400, 123 A. 333, 31 A.L.R. 248. * * *

"* * *. The present situation is conducive to confusion and uncertainty, with potentialities for argument, 'bluffing', litigation, expense and delay that has not been fully realized. * * *. It may be that the need of discouraging a practice on the part of bankrupts of liquidating their assets and concealing the proceeds is so strong in this country that all other considerations should be overborne. If there are to be no protected transactions after the filing of the petition, it would clarify the situation to say so."

The foregoing is forceful language, but, unfortunately, the Congress did not clarify the situation, as it is pointed out it might well have done by expressly indicating the relation that the new section 70, sub. d(4) was intended to bear to the old section 70, sub. a.

We find no reported decision which deals with the precise question here in issue. However, the facts in In Re Chandler, 290 F. 988, a decision of the District Court of the Eastern District of Pennsylvania, decided in 1923, which was not appealed, and upon which the Companies in the present cases largely rely, are somewhat more analogous to the facts before us than are those in the Frederick case. In the Chandler case the bankrupt's life insurance policies had lapsed for non-payment of premium prior to the filing of a petition for involuntary bankruptcy, but the policies were kept in force after the filing of the petition by the insurance company, in accordance with their terms, by applying the surrender value to the payment of the premiums. The cash surrender value of each of the policies on the date when the petition was filed was $345.35, but on the date of the trustee's demand it was somewhat less. The Court held that the insurance company was liable to the trustee only for the surrender value at the date of the trustee's demand therefor. The Court said, 290 F. 991–992: "Burlingham v. Crouse [228 U.S. 459, 33 S.Ct. 564, 57 L.Ed. 920], and Everett v. Judson [228 U.S. 474, 33 S.Ct. 568, 57 L.Ed. 927], also Andrews v. Partridge, 228 U.S. 479, 33 S.Ct. 570, 57 L.Ed. 929, were cases in which the controversy arose over the title to the proceeds of policies where the bankrupt insured had died after bankruptcy. The court did not, in these cases, decide the question here presented, namely, at what date the cash surrender value is fixed as between the trustee and the insurance

company, when there is no claim by the bankrupt, or by his legal representatives, under a policy matured after the date of filing the petition by reason of his death or otherwise. The insurance company had no interest in the disposition of the proceeds in either case. In the present case, if the bankrupt had elected to pay the surrender value to the trustee, the rules there announced would apply as between the bankrupt and the trustee. The policies would then remain the property of the bankrupt, who would not be limited in dealing with them. In case, however, he should desire to receive the surrender value from the insurance company, he would be in no better position than if he had not become bankrupt, but could only obtain the surrender value as of the time of the actual surrender of the policy. *In this case, the bankrupt did not elect to act at all, and the policies then stood as the property of the trustee, with the right on his part to claim the surrender value, but only under the conditions of the policies."* (Emphasis supplied.)

We believe that the above reasoning in the Chandler case is sound, and that the principle underlying it is applicable to the facts now before us. See also to the same effect Martin v. New York Life Ins. Co., 104 F.2d 573, a decision of the Circuit Court of Appeals for the Seventh Circuit, rendered in 1939, but upon a state of facts that antedated 1938, when the Bankruptcy Act was amended; and also Hummel v. Equitable Life Assurance Society, 151 F.2d 994, a decision of the same Appellate Court in 1945, but also upon a state of facts arising prior to 1938. The basis on which the Chandler decision rests is, as stated in the Court's opinion, that the trustee's "rights rise no higher as against the insurance company than those of the bankrupt. The time at which the surrender value was so fixed, therefore, was fixed as against the trustee in the same manner as against the bankrupt."

We believe the argument advanced by the Companies is sound that life insurance is governed exclusively by the insurance proviso in subsection (5) of section 70, sub. a, and not by the other provisions of section 70, sub. a, and that this conclusion is supported by the essential difference between this proviso and all other parts of section 70, sub. a with reference to the right of the trustee in the property governed by them. As counsel for the Companies point out, examination discloses the following differences: (1) under the eight categories of property enumerated in the eight subdivisions of section 70, sub. a, all such property of the bankrupt passes to the trustee, but under the insurance proviso of subsection (5) of section 70, sub. a, all the property of the bankrupt in life insurance does not pass to the trustee, but only the cash surrender value of it; (2) the bankrupt's property in the eight categories passes to the trustee as of the date the petition is filed, but under the insurance proviso of subsection (5) the cash surrender value of life insurance does not pass to the trustee until thirty days after this value has been ascertained and the policy surrendered to the issuing company; and (3) this cash surrender value does not pass to the trustee as property defined in any of the eight categories of section 70, sub. a but under the insurance proviso of subsection (5) of that section, wherein it is provided that "otherwise the policy shall pass to the trustee as assets".

It is clear that under the insurance proviso of subsection (5) no proceeding can be instituted by the trustee to obtain the cash surrender value of a policy until thirty days after this value has been ascertained by the trustee. Until then the trustee has no right to recover any cash surrender value since, until that time, the bankrupt may elect to pay the cash surrender value and continue to carry the policy free from the claims of his creditors. More specifically, the Companies contend—and we believe correctly—that the very language of the insurance proviso in subsection (5) indicates that it is not intended that a life insurance policy or

any of the rights that it embodies shall vest in the trustee when the petition in Bankruptcy is filed, for two reasons. First, the insurance proviso of subsection (5) declares that, after the bankrupt has paid or secured the trustee for the cash surrender value of the policy, he shall "continue to hold, own, and carry such policy * * *", which must mean that the insured shall continue to hold what he never lost. In other words, the cash surrender value does not first vest in the trustee, to be later divested and then revested in the policy holder, but, on the contrary, there is the continuation of ownership in the policy holder unless and until he fails to secure the trustee. As pointed out by counsel for the Companies, the policies here involved are the standard type and contain the following provision: "Cash Surrender value of Fully Paid Policy—If this policy shall become paid by its terms, the insured may surrender this policy * * * and receive its cash surrender value less any indebtedness thereon." Thus, as contended, if the trustee is vested with the cash surrender value subject to being divested by the bankrupt and then revested, such is accomplished in complete disregard of the above quoted provision. In other words, ownership of the policy, with all of its rights and obligations, will have been transferred from the policy holder to the trustee, and then back to the policy holder, without any endorsement of the policy or knowledge on the part of the issuing company of these changes in ownership.

The second reason, as the Companies contend, that requires the conclusion that a life insurance policy or any of the rights that it embodies does not vest in the trustee when the petition in Bankruptcy is filed is that the insurance proviso of subsection (5) expressly provides when the policy shall pass to the trustee. It first says that if the bankrupt does not secure the trustee for the cash surrender value of the policy, "the policy shall pass to the trustee as assets". In other words, the policy passes to the trustee only if the bankrupt does not se-cure the trustee. Until failure to do so, the above-quoted language of the proviso is inoperative, and the ownership of the policy continues in the policy holder. Actually, neither the bankrupt nor the trustee had title to the cash surrender value until paid. The most either has acquired is a contractual right given them by the policy to be paid by the insurance company the cash surrender value, upon forwarding the policy to the company's home office.

We conclude that the cash surrender value of the policies did not vest in the trustee on August 6, 1951, when the petition in bankruptcy was filed. Neither at nor prior to that time did the bankrupt himself have title to the cash surrender value. At most, he had a contractual right to be paid such value. The loans on the policies were obtained by him through fraud upon the Companies between August 21 and August 29, 1951. The trustee, acting under the insurance proviso of subsection (5), made no demand upon the bankrupt until six months later, namely on February 20, 1952. The trustee had no right to compel the payment of this cash surrender value to him until thirty days later, that is, on March 22, 1952. Long prior to that time, however, the cash surrender value had been diminished by the loans. It thus follows that the cash surrender value thus diminished is the most that the Companies can be compelled to pay to the trustee.

In view of our conclusion, it becomes unnecessary to decide the third main issue in these cases, namely, whether, even if the Companies were found not to be entitled to subtract from the cash surrender value of the policies as of the date of the filing of the petition in Bankruptcy, the full amount of the loans which Callis fraudulently obtained from the Companies subsequent to that date, would the Companies nevertheless be entitled at least to credit for the sums paid by Callis, out of the proceeds of these loans to his creditors, who would otherwise have been entitled to file claims in the Bankruptcy proceeding. We will,

however, make the following observation on this question as follows:

The Companies argue that part of the funds paid as loans on the policies to Callis subsequent to the filing of the petition in Bankruptcy were used by him for the benefit of his estate. Therefore, they claim that they are entitled to credit for the full amount of such benefits against their liability to account to the plaintiff for the cash surrender values of the policies. Section 64 of the Act, 11 U.S.C.A. § 104, provides that where there has been a legitimate benefit to a bankrupt estate by way of preserving its value, the cost of doing so is a debt entitled to prior payment. Also, section 62 of the Act, 11 U.S.C.A. § 102, provides for the payment out of the bankrupt's estate of the actual necessary cost and expenses incurred by duly authorized persons. See Goldie v. Cox, 8 Cir., 130 F.2d 690; Collier on Bankruptcy, 4th Ed., Vol. 3, p. 1426.

It is asserted, however, on behalf of the trustee that the payments by Callis claimed to have benefited his estate, were, for the most part, payments of debts due general creditors for services, etc., nearly all of which were performed or delivered prior to the date of the filing of the petition in Bankruptcy and that, therefore, if the Companies are allowed to offset such payments this would amount to granting preference after bankruptcy for certain debts which accrued prior to the filing of the petition, in contravention of sections 62 and 64 of the Act, 11 U.S.C.A. §§ 102 and 104. Therefore, it is maintained that the Companies are entitled to claim credit only to the extent that the funds which they loaned were used to pay claims entitled to priority, and which the trustee would otherwise have been obliged to pay in full. However, it is not sufficiently clear from the testimony and the arguments of counsel what was the precise extent to which the proceeds from the loans were used to pay claims entitled to priority. Therefore, were it necessary to decide this question, we believe more evidence would be required.

The decisions of the Supreme Court ending with the Frederick case, which we have analyzed, clearly establish that prior to the passage of the Chandler Act amendments in 1938, a trustee in bankruptcy was entitled to the cash surrender value, as of the date of the filing of the petition, of all insurance policies then outstanding on the life of the bankrupt, subject, however, to the right of the insurer to credit against such value any payments made by it after the filing of the petition, provided such payments were made in strict compliance with the terms of the policies, and without any notice to the trustee of the pending bankruptcy proceedings. In other words, the Supreme Court affirmed the special position in which contracts of insurance were placed by the proviso in Section 70, sub. a.

In the present litigation, we have been urged to hold that the Frederick case is no longer law in view of the Chandler Act amendments contained in section 70, subs. d(4) and (5). The rule of statutory interpretation is stressed, that a statute, general in its language, is to be given general application. Louisville & Nashville R. Co. v. Mottley, 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297; Addison v. Holly Hill Fruit Products Co., 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488. The warning is given that if the 1938 amendments are not construed as overruling the Frederick case, life insurance will be accorded a specially favored position not accorded other bankruptcy assets. However, since the Bankruptcy Act of 1898 life insurance has been so favored, and in order to overthrow a long established principle, such as that embodied in the Frederick case, by new legislative enactment, the intent of Congress to do so must appear in clear and unequivocal language. This we do not find in the 1938 amendments. No material change has been made in the original proviso of section 70, sub. a relating to insurance. A change may have been intended, removing insurance from its special position, but there is no language sufficiently clear to warrant saying that this intent

has been effected. What drafters or text writers may have said regarding the purpose sought to be achieved by the 1938 amendments is not sufficient to justify what would be tantamount to judicial legislation by this Court.

This conclusion is based solely upon an interpretation of the decisions as set forth in this opinion, and upon what is believed to be the correct rule of statutory construction, that is to say, entirely apart from the contention of the Companies that a contrary conclusion would have a most serious consequence upon the entire life insurance industry.

To summarize our conclusions: the trustee is not entitled to recover from the Companies the full cash surrender values of their policies as of August 6, 1951, but only such values less the full amount due on the loans fraudulently obtained by Callis from the Companies subsequent to that date.